**SO ORDERED.**

**SIGNED this 23rd day of October, 2019.**



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

In re:

Taukita Lauryce Sharp,

Debtor.

Case No. 19-40265-13

**Memorandum Opinion and Order Overruling
Objection to Confirmation of Debtor's Chapter 13 Plan**

Debtor Taukita Lauryce Sharp filed her Chapter 13 bankruptcy petition only twenty-one days after she purchased a vehicle from Creditor PayDay Motors, Inc. d/b/a AutoStart, and the Creditor now opposes confirmation of Debtor's proposed Chapter 13 plan on two bases: 1) that the plan was not proposed in good faith under 11 U.S.C. § 1325(a)(3)[1] and 2) that

---

[1] All future statutory references are to title 11, the Bankruptcy Code, unless otherwise stated.

Debtor's plan to pay Creditor over a longer period of time than the parties' contract envisioned will leave Creditor without adequate protection for its interest under § 1325(a)(5)(B)(iii)(II).[2] The Court finds no fault in Debtor's proposed plan and its treatment of Creditor's claim, and therefore overrules Creditor's objection to confirmation.[3]

I. **Findings of Fact**

Debtor has been a part of the bankruptcy system before, as she has one prior bankruptcy case. That case, also a Chapter 13, was filed in March 2013 due to a garnishment that was making it difficult for Debtor to keep current on her household bills. At that time, Debtor reported net income of $1589.32 a month and $270 in food program assistance. Debtor had three children, and monthly expenses totaling $1682. Debtor reported a 1997 Chevy Suburban with 110,001 miles on her Schedule B, and she owned the vehicle outright. Debtor testified that the engine stopped working on the Chevy Suburban some time in 2016 or 2017. Also around that same time frame, Debtor added a fourth child to her household.

Despite these changes, Debtor made her Chapter 13 plan payments for five years via an employer pay order and completed payments on her case in

---

[2] A trial on confirmation of Debtor's plan was held on September 6, 2019. Debtor appeared by Gary Hinck and Creditor appeared by Keven Grauberger.
[3] Doc. 25.

2

August 2018. Debtor received her discharge on September 27, 2018, and the case was closed shortly thereafter.

Debtor's oldest child has a Ford Focus, and after Debtor's Suburban stopped working, Debtor began using the Ford Focus when she needed transportation. But the car was too small for Debtor's large family and Debtor's daughter needed her own vehicle for school and work, so Debtor began shopping for a new vehicle once she received her 2018 tax refunds.

Creditor has operated as an auto dealer in Topeka for a little over a year, although the general manager, Nelson Tucker, has also operated a dealership in Wichita for thirty years. Between the dealerships, Creditor completes about 1200 retail sales a year, specializing in credit-challenged customers. Ultimately, Debtor purchased from Creditor a 2007 GMC Yukon XL with 213,000 miles on February 26, 2019. Debtor picked the Yukon because it was similar to her prior Suburban and she liked the large size and how the vehicle drove. Debtor had the Yukon inspected by her regular mechanic before she purchased it, and the mechanic thought it was a good vehicle with a good engine and transmission. Debtor's mechanic was not worried about the high mileage on the Yukon, because he thought that type of vehicle would run a long time.

Debtor signed a Retail Installment Contract and Security Agreement with Creditor, although she admits she did not spend long reviewing it before

signing. Debtor paid $1000 as a down payment at the time she signed the contract; funds she had because of her state tax refund. Debtor agreed to finance $16,676.75 at 21.5% interest, with one payment of $1000 due on March 4, 2019, and seventy-eight bi-weekly payments of $275 (although Debtor may not have understood at the time she signed the contract that the 78 payments were bi-weekly, not monthly).[4] Of the $16,676.75 total financed, $1481.75 went to the payment of sales tax. The total purchase price also included an 18-month, 18,000-mile warranty, which Creditor values at about a thousand dollars.

    Debtor has only a ninth-grade education, is a single mother to her four children, and works as a certified nursing assistant. Debtor has been with her employer on and off since 2007. Debtor has not had much experience purchasing vehicles. With the Chevy Suburban she owned most recently before the Yukon, she paid $3500 cash. This experience with Creditor is only the second time Debtor has financed a vehicle.

    About five days after Debtor purchased the Yukon, she drove the vehicle to Kansas City (about an hour away) to go shopping and the Yukon broke down in Kansas City. Debtor had to have the vehicle towed back from Kansas City to her home. Creditor then towed the Yukon to its approved

---

[4] A final payment of $264.45 was due on March 21, 2022.

4

Case 19-40265    Doc# 45    Filed 10/23/19    Page 4 of 20

repair shop and paid for the Yukon to have a new alternator and battery. The repair shop had the Yukon for a day or two, and when Debtor inquired about picking it up, she was informed that she needed to make the $1000 payment due on March 4, 2019 under the parties' contract before the repair shop would release the vehicle to her. Debtor actually made a payment of $815, because Creditor reimbursed her for half of the cost to tow the Yukon from Kansas City back to Topeka.

    Debtor has also spent about an additional $500 on other repairs and improvements for the Yukon. Debtor paid to get some rust painted and the brakes tuned up. Debtor has paid for two oil changes, and gets the oil changed on a regular schedule with a local vendor. Debtor also paid to have the front windows tinted. Debtor says the Yukon does have a gas flow issue and she plans to take the Yukon to her local mechanic to get that fixed. Debtor testified that she wants to keep the maintenance up on the Yukon so that it runs well into the future. Debtor has full coverage insurance.

    At about this same time, Debtor was talking to a coworker about her money trouble and a coworker recommended that she file a new bankruptcy case. Debtor was concerned about her finances because she thought a garnishment was coming due to her outstanding utility bills and other bills/loans coming due. Debtor was also concerned about the shut off of her utilities because the cold weather was about to end. Debtor was also

5

experiencing changes to her income because of her employer's patient census being down, which caused her hours to be reduced. Debtor thought that she had to wait three to five years after a previous discharge before she could file bankruptcy again, but she made an appointment with her bankruptcy attorney for March 8, 2019, to discuss her options.

On March 12, 2019, Debtor attended a hearing on a lawsuit filed against her by Topeka Public Schools concerning outstanding fees due. The return of service shows that the petition and summons for that suit were left at Debtor's door on February 13, 2019, and Debtor remembers that she found out about the suit because of papers placed on her front door, but she has no memory of the date when she actually learned about the suit. Regardless, at that March 12, 2019 hearing, Debtor told counsel for Topeka Public Schools that she was planning to file bankruptcy.

On March 19, 2019, Debtor filed her current Chapter 13 bankruptcy petition. Debtor listed all her debts and assets to the best of her knowledge. Regarding her income at filing, Debtor reports net income from her employer of $1782.82 per month, food assistance of $440 per month, and SSI payments for one of her children at $405 per month that she has been receiving since January 2019. Debtor very rarely receives child support payments—in her words, only "once in a blue moon." Debtor reports monthly expenses of $2210. Debtor budgets only $90 per month for transportation expenses, despite the

6

Case 19-40265    Doc# 45    Filed 10/23/19    Page 6 of 20

fact that she indicated she fills up her gas tank every bi-weekly paycheck, and it usually costs $50 to $60 each time. Obviously, that does not leave funds for maintenance. Debtor does have a budget of $70 for entertainment and a healthy food budget, however, that she indicated gets used for other things as needs arise. Debtor also indicated that sometimes her daughter helps with fuel expense.

Debtor's proposed plan is for a monthly plan payment of $415 to be paid via an employer pay order. Debtor testified that she has been able to afford that payment, and that she chose to have the payment taken out of her paycheck because it is easier for her to budget that way. Debtor's plan pays Creditor the full amount of its claim, stretched over five years, at the Trustee's interest rate and promises a minimum to Creditor each month of $278. Debtor values the vehicle at filing at only $10,500, however the Court did not hear evidence supporting that number. Debtor expressly testified that she did not plan to file bankruptcy at the time she purchased the Yukon.

Nelson Tucker testified at length about the valuation and depreciation of vehicles. The entities that loan funds to Creditor charge about 15% interest, and so to maximize the return on the vehicles sold by Creditor, Mr. Tucker limits the length of time he is willing to finance a vehicle purchase from about eighteen months to four years, depending on the age and mileage of a vehicle. Mr. Tucker stated that the maximum length of time he was

7

willing to finance the 2007 GMC Yukon was thirty-six months, due to the ability of the vehicle to last and to ensure the vehicle is functional at the end of the loan. Mr. Tucker acknowledged that a vehicle like a Yukon was not as concerning to have more than 200,000 miles, and that the body would hold up better than, e.g., passenger cars.

Mr. Tucker believes the Yukon was probably valued at about $40,000 when it was new in 2007. The sales price of the Yukon on February 26, 2019—twelve years later—was $17,475.75. From that, however, to determine value, Mr. Tucker believes the sales tax of $1481.75 and the warranty value of $1000 should be deducted, and that the value of the Yukon at purchase was probably between $14,000 and $15,000. The NADA value confirms this, as it gives a $14,000 NADA average for value. Given the age and condition of the Yukon, and Debtor's financial condition, Mr. Tucker believes the value of the Yukon would be between $2500 and $3500 in thirty-six months and that the Yukon would be worth only salvage value of about $500 at the end of a five-year plan. Mr. Tucker claims that vehicles typically depreciate more rapidly for his customers, because they are lower income and may not have money for maintenance. Mr. Tucker believes he needs to receive between $450 and $500 per month to be adequately protected. Counsel for Creditor

placed the requested adequate protection much lower at about $350 per month, with interest at the *Till* rate[5] included.

## II. Conclusions of Law

Plan confirmation is a contested matter, and a core proceeding over which this Court may exercise subject matter jurisdiction.[6]

Creditor objects to Debtor's proposed plan on two bases: (1) Debtor's plan, filed only twenty-one days after purchase of the GMC Yukon, significantly lowers the interest rate from the parties' contract and proposes a longer repayment term than the parties' contract, and Creditor argues that the totality of the circumstances show that the plan was not proposed in good faith as required by § 1325(a)(3); and (2) Debtor's plan to pay Creditor over a longer period of time than the parties' contract envisioned will leave Creditor without adequate protection for its interest under § 1325(a)(5)(B)(iii)(II).

---

[5] *See Till v. SCS Credit Corp.*, 541 U.S. 465, 477 (2004) (holding that a secured creditor in a Chapter 13 case is entitled to receive a discount rate that is equal to the national prime rate plus a risk adjustment).

[6] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Amended Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy Judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order 13-1, *printed in* D. Kan. Rules of Practice and Procedure (March 2018).

A.  **Good Faith**

Debtor, as proponent of her Chapter 13 plan, bears the burden of proof to show that her plan meets the requirements for confirmation found in § 1325(a).[7] Specifically, § 1325(a)(3) requires that a Chapter 13 plan be "proposed in good faith and not by any means forbidden by law." The phrase "good faith" is not defined by the Code.

In *Flygare v. Boulden*,[8] the Tenth Circuit advised that bankruptcy courts should analyze good faith challenges to Chapter 13 plans by asking "whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13," judging "each case on its own facts after considering all the circumstances of the case."[9] The Court in *Flygare* expressed the following non-exclusive factors for determining a debtor's good faith under § 1325(a)(3):

> (1) the amount of the proposed payments and the amount of the debtor's surplus;
> (2) the debtor's employment history, ability to earn and likelihood of future increases in income;
> (3) the probable or expected duration of the plan;
> (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt

---

[7] *Alexander v. Hardeman (In re Alexander)*, 363 B.R. 917, 921–22 (10th Cir. BAP 2007) (noting that "courts have concluded that the proponent of a Chapter 13 plan has the burden of proof to show that the § 1325(a) tests have been met" and agreeing with that line of cases; specifically holding that the debtor has the burden of proving good faith under § 1325(a)(3)).
[8] 709 F.2d 1344 (10th Cir. 1993).
[9] *Id.* at 1347 (internal quotation marks from *United States v. Estus (In re Estus)*, 695 F.2d 311, 316–17 (8th Cir. 1982) omitted).

10

and whether any inaccuracies are an attempt to mislead the court;
(5) the extent of preferential treatment between classes of creditors;
(6) the extent to which secured claims are modified;
(7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7;
(8) the existence of special circumstances such as inordinate medical expenses;
(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;
(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and
(11) the burden which the plan's administration would place upon the trustee.[10]

The weight given to each of these factors must vary, depending on the facts and circumstances of each case.[11]

The continued viability of the *Flygare* factors, although not overruled, has been questioned by subsequent Tenth Circuit cases. In *Anderson v. Cranmer (In re Cranmer)*,[12] the Tenth Circuit noted in a footnote that the Bankruptcy Code has been amended since *Flygare* was decided in 1993 to include § 1325(b),[13] and that "[s]ection 1325(b)'s 'ability to pay' criteria subsumes most" of the *Flygare* factors such that the "good faith inquiry now

---

[10] *Id.* at 1347–48 (internal quotation marks from *Estus* omitted).
[11] *Id.* at 1348.
[12] 697 F.3d 1314 (10th Cir. 2012).
[13] Section 1325(b) requires that a debtor commit their projected disposable income to their Chapter 13 plan for the applicable commitment period.

11

has a more narrow focus."[14] The Tenth Circuit stated in *Cranmer* that bankruptcy courts still need to consider "factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code."[15] When considering the good faith analysis for that case, the *Cranmer* court noted that "[i]t simply was not bad faith for [the debtor] to adhere to the provisions of the Bankruptcy Code and, in doing so, obtain a benefit provided by it."[16]

In Debtor's case, the Court does not doubt that Debtor has stated her income and expenses correctly. She has recently been through the Chapter 13 bankruptcy process, and little has changed from her reporting in that case. Her income and expenses are fairly consistent, adjusting for time. The Court also sees no fraudulent misrepresentations or efforts to mislead the bankruptcy court. Debtor was thorough and accurate in her testimony and the Court did not doubt any of her reporting. Despite all that, the crux of the

---

[14] *Id.* at 1319 n.5 (internal quotations omitted); *see also Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 668 n.7 (10th Cir. 1993) (noting amendments to the Bankruptcy Code and stating that "the relevant factors to the analysis of good faith" include "whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentations to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code").

[15] *Cranmer*, 697 F.3d at 1319 n.5 (internal quotations omitted).
[16] *Id.* at 1319; *see also Young v. Young (In re Young)*, 237 F.3d 1168, 1177 (10th Cir. 2001) (noting that it is not bad faith to assert rights provided under the Bankruptcy Code).

good faith inquiry in this case is whether Debtor has unfairly manipulated the Bankruptcy Code. In other words, was Debtor contemplating bankruptcy at the time she purchased the Yukon and entered into the financing agreement with Creditor? Did Debtor intend to purchase the vehicle—promising to repay at the rate and terms in the contract—and then quickly turn around and file bankruptcy so as to stick Creditor with a (more affordable to her) lower rate over a longer term?

Creditor contends the short time between Debtor's purchase of the Yukon and the filing of her Chapter 13 petition indicate the answer to those questions is "yes." Only twenty-one days passed between the two events, and only ten days passed between the purchase of the Yukon on February 26 and Debtor's first meeting with counsel on March 8. And really, the time is even shorter than that—Debtor surely called for an appointment with counsel at some even earlier point.

That said, what else was happening the first week of March 2019? Debtor had just purchased a vehicle, that she was now having to have towed back home because it was not working. We know that half of the tow expense was paid by Creditor after the fact, but Debtor would have been out the

upfront tow cost of approximately $370.[17] Debtor had used her tax refund for the down payment and first payment on the Yukon, and she testified that she in the past had used her tax refund money to catch up on household necessities and to become current on her utilities. But those utilities were coming due, and the cold weather rule was about to end such that Debtor's household may soon lose its ability to function without water, electricity, etc. Debtor was concerned about a garnishment, and her hours were being reduced at work. She had been sued by her children's school district for unpaid bills. And finally, Debtor credibly testified that she misunderstood the bankruptcy process, and only then learned that she could file bankruptcy again. Binding precedent requires this Court to look at the totality of the circumstances when faced with the question of a debtor's good faith in proposing a Chapter 13 plan.[18] The Court has performed this searching inquiry herein and concludes that Debtor has carried her burden to show that her plan was filed in good faith. Yes, the time frame between the purchase of the Yukon and Debtor's contemplation of bankruptcy was short, but there is

---

[17] Debtor testified that Creditor reduced her $1000 payment on March 4, 2019 from $1000 to $815, to reimburse her for half of the towing expense. ($1000-$815 = $185. And $185x2 = $370.)

[18] *Flygare*, 709 F.2d at 1344 (stating that good faith inquiry should judge "each case on its own facts after considering all the circumstances of the case"); *Cranmer*, 697 F.3d at 1319 ("The good faith determination is made on a case-by-case basis considering the totality of the circumstances.").

14

no evidence by which the Court could find that Debtor's Chapter 13 plan is "an abuse of the provisions, purpose or spirit of Chapter 13."[19]

## B. Adequate Protection

Section 1325(a)(5)(B) is multifaceted. The section permits Chapter 13 debtors to retain secured collateral, as long as the secured creditor is provided a stream of payments equal to the amount of their secured claim, and as long as certain conditions are met concerning retention of the lien. In addition, "[t]his section mandates that the secured creditor receive the present value of its claim as of the petition date."[20] Finally with regard to this section, if the claim is secured by personal property, then "if the plan provides for periodic payments, such payments must be in equal monthly amounts and must be in an amount sufficient to provide adequate protection to the secured creditor."[21] This final requirement "is designed to protect the secured creditor from any decrease in the value of its collateral during the life of the Chapter 13 plan."[22]

---

[19] *Id.* at 1347.
[20] *In re Vega*, 344 B.R. 616, 619 (Bankr. D. Kan. 2006). Under this section, "the debtor must pay the present value of the entire claim." *In re Ballard*, 526 F.3d 634, 640 (10th Cir. 2008).
[21] *In re Vega*, 344 B.R. at 619.
[22] *Id.* at 620; *see also In re Willis*, 460 B.R. 784, 790 (Bankr. D. Kan. 2011) ("[I]f the security is personal property, the payments must be sufficient to adequately protect the collateral, in other words, compensate the creditor for collateral depreciation over the life of the plan."); *In re Denton*, 370 B.R. 441, 448 (Bankr. S.D. Ga. 2007) ("Section 1325(a)(5)(B)(iii)(II) now explicitly requires post-confirmation adequate protection and further specifies that it must be in the form of money.").

15

A secured creditor is entitled to have its interest in the collateral protected from diminution by reason of a debtor's bankruptcy estate having ongoing possession and use of the creditor's collateral.[23] Courts that have considered the issue of post-confirmation adequate protection have concluded that post-confirmation adequate protection is "irrelevant" unless the payment stream that pays the value of the claim does not "also adequately protect the value of the collateral, as when the collateral depreciates faster than the debtor's payments can offset."[24] In other words, "the principal reduction achieved by the equal monthly payment" required by § 1325(a)(5)(B)(iii)(II) must be "sufficient to offset any depreciation of the collateral."[25]

To extrapolate a monthly depreciation amount for purposes of calculating monthly adequate protection payments, the Court must assess the value of the 2007 Yukon. Debtor provided no evidence of value at trial, other than to elicit testimony from Mr. Tucker that the 2007 Yukon would have been purchased new for approximately $40,000. Based on the cumulative testimony from Mr. Tucker, the Court concludes that at the time Debtor filed her Chapter 13 bankruptcy petition in March 2019, the Yukon

---

[23] *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 370-71 (1988).
[24] *In re Denton*, 370 B.R. at 449.
[25] *Id.*

was valued between $14,000 to $15,000.[26] Mr. Tucker then testified that the Yukon will depreciate over the thirty-six months post-filing until it is valued between $2500 and $3500 at the end of the third plan year. Then over the next additional twenty-four months, at the close of Debtor's case, Mr. Tucker testified that the Yukon will be valued at about $500.

Debtor contends that her proposed equal monthly payment of $278 to the creditor is sufficient to cover any depreciation the creditor incurs for its collateral. Creditor disagrees. Based on the above numbers, Creditor believes the Yukon depreciated at a rate of $173.61 to $180.56 per month between 2007 (when it was new) and 2019 (when Debtor purchased the vehicle).[27] Those numbers are certainly believable, as they indicate a depreciation value between 1 and 1.5%, a range which is widely used to pinpoint monthly depreciation. The next numbers in Creditor's testimony are less believable,

---

[26] Creditor's testimony about value was, at best, varying. At one point, Mr. Tucker claimed the value at purchase was about $16,000. The value stated on Creditor's proof of claim is $16,500. Creditor most often testified to a value number of between $14,000 and $15,000. The math does not exactly get there, but it's close: the Yukon was purchased for $17,676.75. Of this, Creditor testified that he "removed" from the value number the $1481.75 in state sales tax and the $1000 in warranty value. That yields a value number of $15,195. The NADA value is slightly lower, at $14,000. The Court does not at all credit Debtor's valuation of $10,500 that she used on her petition. To sum, the Court finds that the value at purchase was most likely between $14,000 and $15,000.

[27] In other words, from $40,000 to $14,000 in 12 years, or about $2166.67 per year, or about $180.56 per month. If the Court uses a $15,000 value in 2019, then the calculation is $40,000 to $15,000 in 12 years, or about $2083.33 per year or about $173.61 per month.

17

however. Despite acknowledging that the rate of depreciation on a vehicle typically slows as the vehicle ages, Creditor would have the Court believe that the Yukon will actually begin to *accelerate* its depreciation to a rate of $291.67 to $347.22 per month, by depreciating from $14,000 to $15,000 to only $2500 to $3500 in value over the next three years.[28] Creditor's numbers then would *slow* the rate of depreciation in years four and five to $83.33 to $125 per month.[29] Despite all this, at one point in his testimony, Mr. Tucker claimed he would need $450 to $500 a month to cover the depreciation on the Yukon, based on his guess that Debtor would drive the Yukon 20,000 miles a year.[30]

---

[28] The calculations are as follows: $15,000 to $2500 in three years is a rate of $4166.67 per year or $347.22 per month; $15,000 to $3500 in three years is a rate of $3833.33 per year or $319.44 per month; $14,000 to $2500 in three years is a rate of $3833.33 per year or $319.44 per month; and $14,000 to $3500 in three years is a rate of $3500 per year or $291.67 per month.

[29] Depreciating from $2500 to $500 in two years is a rate of $1000 per year or $83.33 per month. Depreciating from $3500 to $500 in two years is a rate of $1500 per year or $125 per month.

[30] Mr. Tucker incorrectly computed Debtor's mileage to date. Debtor testified that she had paid for two oil changes since she purchased the Yukon in February 2019. Per Mr. Tucker, an oil change is required every three to five thousand miles. Mr. Tucker computed Debtor's mileage at nine to fifteen thousand miles in seven months, not six to ten thousand miles.

The $450 to $500 a month figure is suspiciously close to the parties' contract amount of $595.83/mo ($275 bi-weekly). But as Creditor must realize, the contract rate would have included Creditor's profit and costs, and there is no evidence at all that the rate of depreciation is similar to the regular monthly payment under the contract.

18

Creditor justifies an increased rate of depreciation because, in Mr. Tucker's view, a debtor in bankruptcy is less likely to have the funds to pay for adequate maintenance on a vehicle, and the vehicle will, therefore, depreciate at a higher speed than normal. Maybe that is true of some debtors, but there is no evidence that is likely in this case. Debtor testified that she is committed to maintaining the Yukon. Debtor has a long-standing relationship with a local mechanic, that she used on both her prior Suburban and to give an opinion on the Yukon prior to purchase. Debtor has regularly paid for oil changes when they come due. Yes, Debtor budgets only $90 a month for transportation expenses, which include gas and vehicle maintenance, but her daughter sometimes helps pay for gas and Debtor has other areas of her budget that she can shift when maintenance on the Yukon is needed. Debtor has very stable income and expenses. She has also spent about an additional $500 on other repairs and improvements for the Yukon since she purchased it about seven months ago: painting of rust, brake tune up, oil changes, and window tinting. Debtor obviously has an incentive to keep the Yukon in good working order. And the Yukon is covered by Creditor's 18-month, 18,000-mile warranty if any major issues arise. Portions of future tax refunds can also be used for vehicle maintenance, as it is Debtor's practice to use those tax refunds to get caught up on life's expenses.

Debtor is the plan proponent, and she bears the burden of proving her plan is confirmable under § 1325.[31] Debtor proposes equal monthly payments to Creditor of $278 per month. At a value of $14,000 to $15,000, that payment appears adequate to cover the depreciation of the Yukon plus the Trustee's interest rate. Mr. Tucker has obviously thought a lot about depreciation and offered competent testimony on behalf of Creditor, but the Court just does not find the numbers provided to be reasonable.

### III. Conclusion

For the reasons stated herein, Creditor's objection to confirmation of Debtor's plan[32] is overruled. The Court finds that Debtor has satisfied her burden of proof under § 1325 for confirmation.

**It is so Ordered.**

###

---

[31] *In re Holliday*, No. 11-62315-13, 2012 WL 1579241, at *4 (Bankr. D. Mont. May 2, 2012) ("Given the pending objections, Debtors have the burden under § 1325(a)(5)(B)(iii)(II) of showing that [the creditors] are adequately protected.").

[32] Doc. 25.